So Ordered.

Dated: October 15, 2025



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

Window Select LLC,          Case No. 23-20646-gmh
                                          Chapter 11

      Debtor.

Paul Swanson, Liquidating Trustee,

      Plaintiff,

     v.                                   Adv. Proc. No. 25-02021-gmh

Frank Cannella, Jr., as Trustee of
the Frank Cannella Jr. Revocable
Living Trust dated April 17, 2012,
et al.,

      Defendants.

**OPINION AND ORDER DENYING FRANK CANNELLA, JR.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

The plaintiff, the liquidating trustee of Window Select LLC under the confirmed

plan in the underlying chapter 11 case, filed this adversary proceeding to avoid five prepetition transfers that Window Select made to facilitate the purchase of residential real estate located at 2705 Bieneman Road, Burlington, Wisconsin (the Property) by Window Select's former principal, Justin Kiswardy, from the Frank Cannella Jr. Revocable Trust dated April 17, 2012 (Cannella), and to recover the transferred property or its value from Kisward or Cannella, or both. Cannella moves for partial summary judgment, contending that the plaintiff cannot recover from Cannella funds Window Select first transferred to Fidelity Title, Inc., to effectuate Kiswardy's purchase of the Property because Cannella was not the initial transferee. The plaintiff disagrees.[1]

I

A

Federal Rule of Civil Procedure 56(a), which Federal Rule of Bankruptcy Procedure 7056 makes applicable in this proceeding, provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

When determining whether there is a genuine dispute of material fact, the court must "construe the evidence in the light most favorable to the non-moving party . . . and give that party the benefit of genuine conflicts in the evidence and all reasonable, favorable inferences." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014) (citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012)). When "conducting [that] review, [the court] 'may not make credibility determinations, weigh the evidence, or decide which interferences to draw from the facts; these are jobs for a factfinder.'" *Bishop v. Air Line Pilots Ass'n, Int'l*, 5 F.4th 684, 693 (7th Cir. 2021) (quoting

---

1. Cannella initially requested summary judgment on all five transfers; however, his reply brief "modifies", which the court understands to mean withdraws, his request for partial summary judgment except as to $726 thousand Fidelity Title received either directly or indirectly from Window Select's bank account. ECF No. 31, at 1 n.1 (describing this modification as "withdrawing [the] motion as to the $104,000 held by Keefe Real Estate").

*Johnson v. Rimmer*, 936 F.3d 695, 705–06 (7th Cir. 2019)).

B

The following facts, to the extent material, are not in dispute.

Window Select operated a home improvement business in southeastern Wisconsin. Customers hired Window Select to install home improvement products, typically paying it a deposit before installation started. Customers owed the balance of the purchase price after Window Select completed the installation. ECF No. 1, at 1, ¶1.

Kiswardy, Window Select's only member, used the business's funds as his own, spending so much on himself that Window Select was unable to make good on its installation contracts. *Id.* at 2, ¶4. By December 2022, Kiswardy's golden goose was cooked, and he resigned as Window Select's managing member. New management—a firm seeking to acquire remnants of Window Select's gutted business—relegated the failing firm to bankruptcy in February 2023. Many of Window Select's existing contracts were then assumed and assigned as modified to TruVista LLC for completion, while the rest were rejected. That December this court confirmed a chapter 11 liquidation plan under which the plaintiff, as liquidating trustee, was assigned the bankruptcy estate's rights to avoid fraudulent transfers, for potential recovery and distribution to creditors. Case No. 23-20646, ECF No. 423, at 20–22.

This adversary proceeding is part of the liquidating trustee's recovery effort. At issue is Kiswardy's use of Window Select's funds to purchase the Property from Cannella for a bit more than $2 million. ECF No. 1, at 11–15, ¶¶40–57.[2] The purchase agreement required Kiswardy to pay $150 thousand in earnest money to the listing broker, Keefe Real Estate. ECF No. 12, at 13 & 14, ¶¶41 & 43; ECF No. 15, at 2, ¶4; Tully

---

2. Kiswardy signed the offer to purchase, accepted counter-offer, and related documents under the alias "Matthew Justin Kiswardy". See, e.g., Tully Decl. Ex. B, at 11, ECF No. 24-2; Tully Decl. Ex. C, at 2, ECF No. 24-3; see also, e.g., George Decl. Exs. K–L, ECF Nos. 23-11 to -12 (business note and security agreement, both signed by "Matthew J. Kiswardy", listed as "Sole Member" of Window Select).

Decl. Ex. B, at 3; Tully Decl. Ex. C, at 2. Window Select satisfied this obligation by transferring $50 thousand to Keefe Real Estate on March 26, 2021, and $100 thousand on April 12, 2021. George Decl. at 2, ¶¶7–8, ECF No. 23; George Decl. Ex. F, at 3, ECF No. 23-6; George Decl. Ex. G, at 2, ECF No. 23-7; Gilbert Decl., ECF No. 26.

The closing was scheduled for May 21, 2021, with Fidelity Title acting as closing agent. George Decl. Ex. H, at 2, ECF No. 23-8; Tully Decl. at 1, ¶3, ECF No. 24. To facilitate the closing, Window Select transferred a total of $680 thousand to Fidelity Title by way of three separate wires—$150 thousand on May 17, $310 thousand on May 18, and $220 thousand on May 19. Tully Decl. Exs. D–F, ECF Nos. 24-4 to -6; Gilbert Decl. In addition, on May 20, Keefe Real Estate transferred $46 thousand of the earnest money to Fidelity Title, which represented the balance of Window Select's $150 thousand deposit, less Keefe Real Estate's broker commission. Tully Decl. at 2, ¶9; Tully Decl. Ex. G, at 2, ECF No. 24-7; see Tully Decl. Ex. H, at 3, ECF No. 24-8 (listing a "[c]ommission to Keefe Real Estate" of $104 thousand). Thus, at closing, Fidelity Title held $726 thousand in funds that originally came from Window Select. To complete the purchase, Kiswardy (through Window Select) borrowed an additional $1.254 million from Greenwood's State Bank. George Decl. Ex. K, at 2; Tully Decl. Ex. I, at 2, ECF No. 24-7.

A day or two before the closing, on May 19 or 20, Fidelity Title signed and returned a letter agreement prepared by Kiswardy's real estate counsel. Granitz Decl. at 1–2, ¶¶1–4, ECF No. 25; Granitz Decl. Ex. A, at 4, ECF No. 25-1. As shown below, Fidelity Title agreed to "hold Buyer's Funds" received "on or before the Closing Date"—totaling more than $1.9 million, including the funds at issue—"in trust pursuant to [the letter's] instructions and not to release any portion of Buyer's Funds" until Fidelity Title was prepared to issue a title insurance policy, received certain necessary documents from the seller, and was instructed in writing ("e-mail or otherwise") by Kiswardy's counsel "to disburse Buyer's Funds pursuant to the Closing Statement." Granitz Decl. Ex. A, at 2–3. The letter agreement further provides that if Fidelity Title

had "not received written direction to proceed by May 21, 2021 at 4 p.m. CDT", it should "contact [Kiswardy's counsel] for further instructions." *Id.* at 3.

Kiswardy's counsel emailed Fidelity Title on May 21 authorizing it to disburse the funds in accordance with the closing statement. Cannella, Jr., Decl. Ex. A, ECF No. 14-2, at 3–4. Fidelity Title then disbursed funds it was holding, including the $726 thousand at issue, to Cannella. Tully Decl. Ex. H.

II

Chapter 5 of the Bankruptcy Code empowers bankruptcy trustees to avoid certain pre-bankruptcy transfers made by the debtor, including under 11 U.S.C. §§544 & 548, and to recover the transferred property or its value from those who benefited from them, including "initial transferee[s]", and, depending on the circumstances, subsequent transferees, which the Code refers to as "immediate or mediate transferee[s]" of the "initial transferee". 11 U.S.C. §550(a)(1) & (2). Section 550 makes initial transferees strictly liable for avoided transfers, but a trustee cannot recover from subsequent good-faith transferees who take for value.[3] *Id.*; see also *Smith v. SIPI, LLC (In re Smith)*, 811 F.3d 228, 244 (7th Cir. 2016) ("[U]nlike an immediate or mediate transferee, the initial transferee has no defense against liability under § 550").

Cannella's request for partial summary judgment turns on whether he was the

---

3. Section 550 provides in relevant part as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544 . . . [or] 548 . . . , the trustee may recover, for the benefit of the estate, the property transferred or, if the court so orders, the value of such property, from—
   (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
   (2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under . . . (a)(2) of this section from—
   (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
   (2) any immediate or mediate good faith transferee of such transferee.

initial transferee of Window Select's $726 thousand that Kiswardy used to purchase the Property. Cannella asks the court to determine that he was not, arguing that "Kiswardy was the initial transferee" because he was the first person to have dominion over the funds after Window Select. ECF No. 14, at 2 & 3. The plaintiff concedes that if Kiswardy was the initial transferee, then Cannella was "a subsequent transferee", which "could immunize him from any liability he might have for the value of the transferred funds". ECF No. 22, at 2. The plaintiff asserts, however, that Kiswardy was "the entity for whose benefit [the] transfer[s] w[ere] made", §550(a), and not a transferee at all. ECF No. 22, at 2 ("Cannella [w]as the initial transferee and . . . Kiswardy [w]as the party for whose benefit such transfers were made.").

A

The Bankruptcy Code does not define "initial transferee", or even "transferee", nor does it provide compelling textual guidance on how to construe "initial transferee" when applying §550. The Seventh Circuit's *Bonded Financial Services, Inc. v. European American Bank* is the leading authority on the matter and is binding precedent here. 838 F.2d 890 (7th Cir. 1988). Bonded's principal had it send a check for $200 thousand to European American Bank "payable to the Bank's order . . . with a note directing the Bank to 'deposit this check into [his] account'", which "[t]he Bank did". *Id*. at 891. Ten days later he "instructed the Bank to debit [his] account $200,000 to reduce the outstanding balance of [a] . . . loan" for another business of his, through which "[h]e . . . owned quite a few horses". *Id.* "The Bank did this", too. *Id.* He "paid off the loan in two more installments", and "[t]he Bank released its security interest in the horses." *Id.*

Soon after Bonded's funds were applied against the balance of the loan, Bonded filed for bankruptcy. The trustee sought to recover the $200 thousand from the bank, contending that the bank, rather than Bonded's principal, was the initial transferee. Rejecting that contention, the court reasoned that not all persons involved in the movement of funds or other property are "transferees" within the meaning of §550: "we

think the minimum requirement of status as a 'transferee' is *dominion over the money or other asset, the right to put the money to one's own purposes*. When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded." *Id.* at 893 (emphasis added). Applying the dominion requirement, the court concluded that the bank was not the initial transferee of Bonded's funds because of the two-step nature of the transaction. In the first step—when the bank deposited the funds into the principal's account—the bank was not a transferee because it did not exercise dominion over Bonded's funds; the *principal* did, so he was the initial transferee. *Id.* at 893–94. In the second step—when the principal used the funds to pay down the balance owed on the horse-business loan—the bank became a subsequent transferee because it could then use the funds as its own, i.e., it had dominion over them:

> As the Bank saw the [first] transaction . . . , it was [the principal's] agent for the purpose of collecting a check from Bonded's bank. It received nothing from Bonded that it could call its own; the Bank was not Bonded's creditor, and [the principal] owed the Bank as much as ever. The Bank had no dominion over the $200,000 until . . . [the principal] instructed the Bank to debit the account to reduce the loan; in the interim, so far as the Bank was concerned, [the principal] was free to invest the whole $200,000 in lottery tickets or uranium stocks. As the Bank saw things [then], it was getting [the principal's] money.

*Id*. (citation omitted) (citing U.C.C. §4-201(1) (Unif. L. Comm'n 1977)). Things would have been different, the court reasoned, if the transaction had only one step:

> If the note accompanying Bonded's check had said: "use this check to reduce [the principal's] loan" instead of "deposit this check into [the principal's] account', § 550(a)(1) would provide a ready answer. The Bank would be the "initial transferee" and [the principal] would be the "entity for whose benefit [the] transfer was made".

*Id.* at 892 (final alteration in original). In that hypothetical, the bank is the first entity to exercise dominion over the transferred funds and therefore the initial transferee. *Id.*

B

Whether Cannella or Kiswardy is the initial transferee of Window Select's funds similarly turns on whether those funds reached Cannella in two steps or one. Cannella argues that he received Window Select's funds in a two-step transaction, as in *Bonded*, because Kiswardy, by arranging to have the funds held at his direction by Fidelity Title, exercised dominion over them before they reached Cannella. The plaintiff contends that the transaction involved only one step, because Fidelity Title acted as a non-transferee intermediary for disbursing the funds to Cannella, not as Kiswardy's agent through which Kiswardy exercised personal dominion over the funds.

While Cannella's main argument is that Kiswardy's agreement with Fidelity Title afforded Kiswardy dominion, Cannella suggests, in passing, that Kiswardy directing Window Select to send the funds to Fidelity Title for purchase of the Property establishes that he was the initial transferee. ECF No. 14, at 7 ("Kiswardy exercised his 'right to put the money to [his] own purposes' by authorizing the use of the funds to buy the Cannella house." (alteration in original) (quoting *Bonded*, 838 F.2d at 893)). But to determine the initial transferee of a debtor's funds one must identify who, *after the debtor*, first had dominion of the funds, *not* who had control of the debtor to disburse the funds. *Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996) ("The issue under § 550 is to what extent the principal, or anyone else for that matter, exercised control over the disputed funds *after* the funds left the debtor."); see also *Henry v. Off. Comm. of Unsecured Creditors (In re Walldesign, Inc.)*, 872 F.3d 954, 964 (9th Cir. 2017) ("[A] principal does not establish dominion by misdirecting company funds directly to a third party for personal gain." (citing *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195, 1199 (9th Cir. 1997))); *Bodenstein v. Univ. of N. Iowa (In re Peregrine Fin. Group, Inc.)*, 589 B.R. 360, 375 (Bankr. N.D. Ill. 2018) (collecting cases). As *Rupp v. Markgraf* explains, this understanding of dominion follows from *Bonded*'s reasoning:

It is clear that the *Bonded* court's discussion of dominion and control refers to dominion and control over *the funds* after the disputed transfer, not dominion and control over the *transferor* before the transfer. This point is illustrated by the fact that the court in *Bonded* presented two sets of contrasting facts, the actual facts before the court and a hypothetical situation. . . . [T]he court concluded that the result would be different in each case. Yet in both cases the principal exercised control over the transferor prior to the transfer of funds and caused the transferor to make [the] transfer. Thus, the court's reasoning in *Bonded* could not have turned on any evaluation of the principal's control over the debtor.

95 F.3d at 940; see also *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588 (11th Cir. 1990); *Ray v. City Bank & Tr. Co. (In re C–L Cartage Co.)*, 899 F.2d 1490 (6th Cir. 1990). Thus, Kiswardy directing Window Select to make the wire transfers to Fidelity Title does not establish Kiswardy as the initial transferee of those funds.

And, to be clear, in arguing that Kiswardy is the initial transferee, Cannella does not contend that Fidelity Title is a transferee (i.e., an entity who exercised dominion over the funds after they left the debtor), rather than an intermediary (i.e., an entity that held the funds for the purpose of making them available to another).[4] See *Bonded*, 838 F.2d at 893 ("The Bank . . . was no different from a courier or an intermediary on a wire

---

4. A footnote in Cannella's reply brief states that he does not "concede" that either Fidelity Title or Keefe Real Estate was a mere intermediary, stating that Fidelity Title "earned" $2,801 in "revenue" for its role in the transaction. ECF No. 31, at 1 n.1. The footnote also says, "According to *Bonded*, an intermediary is an entity or individual that only holds funds 'for the purpose of fulfilling an instruction to make the funds available to someone else.'" *Id.* (quoting *Bonded*, 838 F.2d at 893). Cannella makes no more of this, so the court rejects whatever argument he might be intending on procedural grounds. "An argument made for the first time in a reply brief is waived" (or forfeited). *Eberhardt v. Walsh*, 122 F.4th 681, 687 n.4 (7th Cir. 2024) (citing *Bradley v. Vill. of Univ. Park*, 59 F.4th 887, 897 (7th Cir. 2023)). So too are arguments that, like this one, are "[p]erfunctory and undeveloped". *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) (citing *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006)). In addition, nothing in *Bonded* suggests that compensating an agent for acting as an intermediary deprives the agent of intermediary status beyond any compensation received from the debtor in payment for its services. And, in all events, neither party argues that Fidelity Title should be deemed an initial transferee, even as to the $2,801 it was paid; therefore, this opinion, adhering to the parties' presentation of their dispute, treats the entire $726 thousand held by Fidelity Title as being initially transferred either to Cannella or Kiswardy.

transfer" when "it held the check only for the purpose of fulfilling an instruction to make the funds available to someone else."). The question at the heart of the parties' dispute is, if not Fidelity Title, who after Window Select was the first to exercise dominion of Window Select's funds: Kiswardy, because the letter agreement gave him dominion of the funds once Fidelity Title received them, or Cannella, because the letter agreement directed Fidelity Title to disburse the funds to Cannella upon satisfaction of the closing conditions?

C

The contents of the letter, from Kiswardy's counsel to Fidelity Title, that Cannella contends gave Kiswardy personal dominion over the funds are as follows:

May 20, 2021

**VIA E-MAIL (lea@fidelitytitleinc.com)**

Fidelity Title, Inc.
101 E. Washington Street
Burlington, WI 53105
Attn: Lea Vos

| | RE: | Buyer: | Matthew Justin Kiswardy |
|---|---|---|---|
| | | Seller: | The Frank Cannella Jr. Revocable Living Trust Dated April 17, 2012 |
| | | Property: | 2705 Bieneman Road, Burlington, WI 53105 |
| | | Your File No. 82465 | |

Dear Lea:

  As you are aware, our firm represents Buyer in connection with the captioned transaction. Please consider this letter agreement as instructions from Buyer regarding the closing on May 21, 2021 (the "Closing Date").

  You will receive from Buyer, on or before the Closing Date, the sum of $1,921,164.22 (together with the earnest money of $150,000, herein collectively referred to as "Buyer's Funds"). Enclosed herein is a PDF copy of the Buyer's signed Closing Statement (the "Buyer's Document").

You are hereby instructed to hold Buyer's Funds and Buyer's Document in trust pursuant to these instructions and not to release any portion of Buyer's Funds or Buyer's Documents until (i) you are prepared to issue an owner's policy in favor of Buyer in the form of the title commitment mark-up attached hereto as Exhibit A (the "Mark-Up"), and (ii) Seller delivers to you the following, which have been properly executed and notarized or authenticated, if necessary:

1. Trustee's Deed in the previously approved form;

2. Seller's counterpart signature to the Closing Statement; and

3. Any affidavits or documents sufficient to cause you to issue the title policy in favor of Buyer consistent with the Mark-Up.

When you are prepared to issue the title policy in favor of Buyer in a form consistent with the Mark-Up, and receive written instructions from me (e-mail or otherwise), you are authorized to disburse Buyer's Funds pursuant to the Closing Statement. Disbursement of Buyer's Funds by you shall be deemed your unconditional agreement to promptly issue the title in favor of Buyer as required pursuant to these instructions.

The original title policy should be promptly forwarded to me after the Closing Date.

If you have not received written direction to proceed by May 21, 2021 at 4 p.m. CDT, please contact me for further instructions.

Please acknowledge your acceptance of these instructions by signing below, and call if you have any questions. Thanks for your help.

Sincerely,

**QUARLES & BRADY LLP**

*[signature]*

Noelle A. Granitz

Accepted and agreed to this __19__ day of May, 2021.

**FIDELITY TITLE, INC.**

By: *Andrew J. Tully*
Name: Andrew J. Tully
Title: V.P.

Granitz Decl. Ex. A, at 2–4.[5]

In contending that the letter agreement establishes that Kiswardy had dominion of the $726 thousand when held by Fidelity Title, Cannella points to several provisions of the agreement: it (1) identifies Kiswardy as the "Buyer"; (2) refers to the funds Fidelity Title would receive, including the $726 thousand at issue, as "Buyer's Funds"; (3) conditions disbursement of the funds on receipt of "written instructions from" Kiswarsdy's counsel; and (4) provides that if Fidelity Title does "not receive written direction to proceed" by the end of the next day, Fidelity Title is to "please contact" Kiswardy's counsel "for further instructions." See ECF No. 14, at 6–8. Cannella contends these provisions show as a matter of law that Kiswardy "was the initial transferee of the $726,000 transferred to Fidelity Title because he had the right to use the funds for his own purposes and buy anything he wanted." ECF No. 31, at 5 (capitalization altered).

The terms of the letter agreement must be understood in context, as an agreement initiated by Kiswardy's real estate counsel to facilitate the closing of Cannella's sale of the Property to Kiswardy and to insure Cannella's delivery of good title to Kiswardy. See *Hirschberg v. Bacher*, 149 N.W. 383, 384 (Wis. 1914) (interpreting the parties' agreement "from [its] context"); *Ryan v. Ryan*, 990 N.W.2d 777, 781 (Wis. Ct. App. 2023) ("[W]e 'consider the language of the contract as a whole, and analyze contract clauses in context, as they are reasonably understood.'" (quoting *MS Real Est. Holdings, LLC v. Donald P. Fox Fam. Tr.*, 853 N.W.2d 627 (Wis. Ct. App. 2014))). So understood the agreement's terms do not establish that Fidelity Title held the funds for Kiswardy's unfettered use.

The letter agreement makes clear that in addition to potentially issuing title

---

5. An attentive reader will observe that while the letter is dated May 20, 2021, Andrew Tully's purported execution of it on Fidelity Title's behalf is dated May 19, 2021. The parties make nothing of this; presumably Mr. Tully simply wrote the wrong date.

insurance, Fidelity Title acted as closing agent, and, in that capacity, received three wire transfers from Window Select, a check from Keefe Real Estate (for $46 thousand in earnest money previously tendered by Window Select), and a check from Greenwood's State Bank for $1.245 million borrowed, pursuant to a business note from Window Select, to fund Kiswardy's purchase of the Property. Tully Decl. at 2–3, ¶¶6–9 & 11. The agreement required Fidelity Title to hold those funds—labelled "Buyer's Funds" because they were Kiswardy's (the buyer's) consideration for Cannella's sale of the Property—until (a) Fidelity Title was "prepared to issue" title insurance to Kiswardy and (b) Cannella delivered to Fidelity Title:

1. Trustee's Deed in the previously approved form;

2. Seller's counterpart signature to the Closing Statement; and

3. Any affidavits or documents sufficient to cause you to issue the title policy in favor of [Kiswardy] consistent with [an attached] Mark-Up.

Granitz Decl. Ex. A, at 2. The agreement thus obligated Fidelity Title to *not* release the funds until, among other things, Cannella had signed the closing statement, thereby "authoriz[ing] Fidelity Title, Inc. to cause the funds to be disbursed in accordance with this statement", Tully Decl. Ex. H, at 3, and Fidelity Title was prepared to insure the transfer of good title at closing. All of this is contrary to Cannella's contention that Fidelity Title was holding these funds, including both the $726 thousand at issue and the $1.245 million disbursed by Greenwood's State Bank, to await Kiswardy's arbitrary direction to either close on the Property or buy mirth, merriment, and music.

Cannella's counterintuitive casting of Fidelity Title as Kiswardy's agent of unbounded dominion over the funds depends on two provisions of the letter agreement that direct Fidelity Title to obtain instructions from Kiswardy's real estate counsel:

(1) "When you are prepared to issue the title policy in favor of Buyer in a form consistent with the Mark-Up, ***and receive written instructions***

>*from me* (email or otherwise), you are authorized to disburse Buyer's Funds pursuant to the Closing Agreement"; and
>
>(2) "If you have not received written direction to proceed by May 21, 2021 [the closing date] at 4 p.m. CDT, *please contact me for further instructions*."

ECF No. 25-1, at 3 (emphasis added). Neither of these provisions can reasonably be understood as contemplating that Fidelity Title would disburse the funds to Kiswardy at his request, e.g., to allow him to buy lottery tickets. The first does no more than afford Kiswardy's real estate counsel the right to grant final approval on Fidelity Title's disbursement of funds "pursuant to the Closing Statement"—that is, to disburse funds to Cannella, the Property seller, and to others who provided services to be paid at closing. Perhaps recognizing this, Cannella leans on the second. He posits that Kiswardy had dominion over the funds entrusted to Fidelity Title because Kiswardy could have directed his lawyer to refuse to give the final closing instruction and then instructed Fidelity Title to "send all of the funds to him." ECF No. 31, at 5. "Kiswardy," Cannella continues, "could have then done anything he wanted with the funds." *Id.*

The undisputed facts do not support Cannella's suggestion that the only reasonable inference is that if Kiswardy's real estate counsel had not sent Fidelity Title instructions to disburse the funds in the manner required by the closing agreement, Fidelity Title would have then followed counsel's instruction to turn the funds over to Kiswardy for his unrestricted, personal use. In context, the letter agreement's direction to Fidelity Title that it should contact Kiswardy's counsel for further instruction if it had not received disbursement authorization by the May 21, 2021 deadline reasonably suggests no more than that counsel would instruct Fidelity Title on whether the deal was going to close. Neither the terms of the letter agreement nor any other evidence marshalled by Cannella puts beyond genuine dispute of fact what Fidelity Title would have done if, for example, Kiswardy had instructed his counsel to tell Fidelity Title that

the deal was off and it should transfer the $726 thousand to Kiswardy's brokerage account so he could buy uranium stocks. Perhaps Fidelity Title, in accordance with industry custom or its default engagement terms (either of which might be found to inform or be incorporated into the letter agreement), would have returned all the funds to their sources if the deal fell through.

Ultimately, none of this affects whether Kiswardy had dominion of the funds when Fidelity Title was holding them, as provided in the letter agreement, under instruction to not disburse them until numerous conditions were satisfied, most of which were beyond Kiswardy's control. Nothing in the agreement authorized Fidelity Title to hold and disburse the funds at Kiswardy's whim. Cannella's counterfactual, in which Kiswardy could have prevented the closing and successfully instructed Fidelity Title to disburse the funds to him, is not a scenario covered by the letter agreement's terms. All the counterfactual suggests is a possible world in which Kiswardy *could have* become the initial transferee if (1) he directed Fidelity Title to disburse the funds to him *and* (2) Fidelity Title did that. In the actual world, Cannella became the initial transferee when Fidelity Title disbursed the funds to him as required by the closing statement.[6]

III

For the reasons stated above, IT IS HEREBY ORDERED that Cannella's motion

---

6. In his reply brief Cannella argues for the first time that "[t]he Debtor did not transfer anything to Cannella", as the term "transfer" is defined in 11 U.S.C. §101(54)(D), and the "alleged transfers were to Fidelity Title or Keefe Real Estate—not Cannella." ECF No. 31, at 2–3. This is an odd argument to make: how then could Kiswardy have been the *initial* transferee of transfers from Window Select, the debtor, through intermediary Fidelity Title to Cannella, as Cannella otherwise supposes? Thankfully, there is no need to answer that question or to address this argument because, again, arguments made for the first time in a reply brief are "waived" (i.e., forfeited), and, for that reason alone, the court will not consider this one. *Eberhardt*, 122 F.4th at 687 n.4 (citing *Bradley*, 59 F.4th at 897). Still, the very fact that §550(a) and (b) address the conditions under which a trustee can recover from any "immediate or mediate transferee of such initial transferee" seems fatal to Cannella's proposed narrow reading of §101(54)(D)'s definition of "transfer", which broadly encompasses "disposing of or parting with" either "property" or "an interest in property" by means both "direct [and] indirect". See also *Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 878–79 (Bankr. N.D. Ill. 2006) ("Fraudulently transferred property itself is generally recoverable from subsequent transferees under § 550(a) . . . .").

for partial summary judgment is withdrawn as to all transfers other than those composing the $726 thousand held by Fidelity Title and denied as to those transfers.

# # # # #